# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**LUPE A. RANGEL,**

    **Plaintiff,**

**vs.**　　　　　　　　　　　　　　　　　　**CIV No. 96-1249 JP/LFG**

**EL PASO NATURAL GAS COMPANY, a foreign corporation,**

    **Defendant.**

## MEMORANDUM OPINION AND ORDER

Defendant moved for summary judgment on plaintiff's Title VII and state law claims arguing that they are barred by the tender back rule and the ratification doctrine.

On November 17, 1997, I entered an Order staying proceedings pending a decision by the United States Supreme Court in *Oubre v. Entergy Operations, Inc.*, which I believed would be directly relevant to issues in this action.[1] Recently, on January 26, 1998, the Supreme Court issued its opinion. *Oubre v. Entergy Operations, Inc.*, 118 S.Ct. 838 (1998).

I now conclude that defendant's motion for summary judgment should be denied.

---

[1] In *Oubre*, the Supreme Court had under consideration whether the tender back rule and the ratification doctrine are valid defenses in cases brought under the Age Discrimination in Employment Act.

**Background**

The background of the case as alleged in the complaint is as follows. Mr. Rangel began working for El Paso Natural Gas Company ("EPNG") in September, 1974 as a lab technician. After Mr. Rangel returned to work following a short term disability absence in January of 1994, Mr. Lambdin, Mr. Rangel's supervisor, began discriminating against him. Mr. Rangel was the only Hispanic in his department of nine employees, and he had the second longest service with EPNG among four lab technicians. Mr. Rangel was the lowest paid lab technician, and was "constantly subjected to racial comments and jokes." Complaint ¶ 10. After Mr. Lambdin falsely accused Mr. Rangel of stealing equipment, and wrote Mr. Rangel up for "minor incidents," Complaint ¶ 12, Mr. Lambdin placed Mr. Rangel on probation for ninety days. Mr. Rangel complained to Mr. Lambdin's supervisor, Mr. Hall, about these incidents. In April, 1994, Mr. Hall informed Mr. Rangel that he would have a new supervisor, Mr. Norvelle, and that Mr. Rangel would be transferred to a comparable position within three to six months. Mr. Rangel was never transferred.

During January and February of 1996, EPNG notified Mr. Rangel and other employees in his department that EPNG was downsizing and that each employee would be retained based in part on a rating from each employee's supervisor. In March of 1996, Mr. Rangel was told that his position was being eliminated and that his evaluation had not been favorable.

Based on these representations, Mr. Rangel signed a separation agreement[2] and received one year's severance pay in exchange for releasing EPNG from any potential liability. Mr. Rangel contends that the only reason he signed the agreement was because he thought his position was being eliminated as a result of the unfavorable evaluation.

Shortly after signing the Agreement, Mr. Rangel learned that his job position had not been eliminated and that in fact EPNG had brought in two new employees from other positions to perform his job duties. Mr. Rangel also discovered that Mr. Norvelle had not, in fact, prepared his evaluation. At the hearing held on June 25, 1997, counsel for Mr. Rangel stated that Mr. Rangel filed a complaint with the EEOC two weeks after his signed the Separation Agreement.

## Legal Standard

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986) (quoting Fed. R. Civ. P. 1). A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is proper when the pleadings, depositions, answers to interrogatories

---

[2]This agreement was "Exhibit A" to the "El Paso Natural Gas Company Severance Pay Plan" ("the Plan"). Section 2.8 of the Plan defines "Separation Agreement" as "[t]he agreement, in the form of Exhibit A attached hereto, which an Employee must execute in order to receive Severance Pay under this plan." Section 3.4 of the Plan states, "No Severance Pay will be paid to any Employee unless that Employee properly executes and delivers to the Company a Separation Agreement within the applicable Time Limit and that Agreement becomes irrevocable. Such Separation Agreement shall not be accepted by the Company unless it is executed on or after the Employee's Termination Date." The Separation Agreement which Mr. Rangel signed states that he released EPNG "from all liabilities, demands, claims, or suits of whatsoever nature that [he] may have against" EPNG.

and admissions on file, as well as any affidavits, "show that there is no genuine issue as to any material fact...." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986) (internal citations and quotations omitted).  Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States,* 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.  In such a situation, the moving party is entitled to judgment as a matter of law "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*, 477 U.S. at 322, 106 S.Ct. at 2550.

## Analysis

Defendant EPNG, relying upon general principles of contract law, states that a contract which is tainted by fraud or misrepresentations may be voided by an innocent party to that contract.  EPNG argues that if the innocent party seeks to avoid performance of a voidable contract, rescission is the appropriate remedy.  According to EPNG, Mr. Rangel's lawsuit is an attempt to rescind the Separation Agreement.

EPNG contends that, for two reasons, Mr. Rangel should not be allowed to rescind the agreement.  First, according to EPNG, in order to void the agreement, Mr. Rangel must tender back the benefits he received under the contract as a condition precedent to filing suit.  Mr. Rangel did not tender back or even offer to tender back the consideration EPNG paid him in exchange for

his agreement to release EPNG from liability for claims arising out of the termination of his employment. Second, EPNG argues that since Mr. Rangel failed to return the consideration paid to him within a reasonable time after he had gained knowledge of EPNG's alleged misrepresentations, Mr. Rangel ratified the Separation Agreement and made it binding.

A.     **Failure to Tender Back**

   1.     *Title VII Claim*

Apparently, neither the United States Supreme Court nor the United States Court of Appeals for the Tenth Circuit have yet considered whether the tender back rule applies to Title VII plaintiffs. The rule has been discussed in a number of other contexts, however. The United States Supreme Court has addressed its applicability to two federal statutes designed to protect employees, the Federal Employer Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.  The Supreme Court in both cases decided against applying the tender back rule.

In *Hogue v. Southern Ry. Co.,* 390 U.S. 516, 88 S.Ct. 1150 (1968), the Supreme Court held that the FELA displaced the tender back requirement and permitted a plaintiff's suit to go forward despite a failure to return the consideration received for a release of claims. The Court reasoned:

> [A] rule which requires a refund as a prerequisite to institution of [an FELA] suit would be wholly incongruous with the general policy of the Act to give railroad employees a right to recover just compensation for injuries negligently inflicted by their employers.

*Id.*, 390 U.S. at 518, 88 S.Ct. at 1552 (internal quotations and citations omitted).

Very recently, in *Oubre v. Entergy Operations, Inc.*, 118 S.Ct. 838 (1998), the United

States Supreme Court considered the applicability of the tender back and ratification doctrines to the ADEA.  There, as here, the employer moved for summary judgment, contending that the employee had ratified a release of all claims against the employer by failing to return the monies she had received.  *Id.* at 840.  The Supreme Court held that the release signed by the plaintiff did not comply with the Older Workers Benefit Protection Act's ("OWBPA") specific requirements regarding releases covering ADEA claims.[3]  29 U.S.C. §§ 626(f)(1)(B), (F), (G).  The Supreme Court concluded that because it failed to comply with the OWBPA, the release should not bar the plaintiff's ADEA claim, even if the employee retained the monies she received in exchange for the release.  *Id.* at 842.

In *Oubre*, the Supreme Court maintained that enforcement of the tender back and ratification rules "would frustrate the statute's practical operation .... "  *Id*.  Justice Kennedy, writing for the Court, explained:

> In many instances a discharged employee likely will have spent the monies received and will lack the means to tender their return.  These realities might tempt employers to risk noncompliance with the OWBPA's waiver provisions, knowing it will be difficult to repay the monies and relying on ratification.  We ought not to open the door to an evasion of the statute by this device.

*Id*.  Similar reasoning applies to employees bringing actions under Title VII.  Indeed, Mr. Rangel stated under oath that he lacked the financial resources to tender back the severance benefits he received from EPNG.  Rangel Affidavit at p.2.

Although it is true that Title VII, unlike the OWBPA, does not have provisions mentioning specifically waivers and/or releases, the statutory goals of the two statutes are very similar in that

---

[3]The OWBPA was a 1990 amendment to the ADEA.  The OWMPA imposes specific requirements for releases of ADEA claims.

the objectives of both are to expand employment opportunities and to combat workplace discrimination.  *See, e.g., Teamsters v. United States*, 431 U.S. 324, 348 (1977) (stating "[t]he primary purpose of Title VII was 'to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens'" quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823 (1973)).  In the Tenth Circuit, the ADEA and Title VII often are interpreted "in tandem."  *Ellis v. United Airlines, Inc.,* 73 F.3d 999, 1007 (10th Cir. 1996) (stating that the ADEA is generally interpreted "in tandem" with Title VII since the ADEA was based in substantial part on Title VII).  In addition, the ADEA and Title VII share common substantive provisions and common purposes.  *See Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544, 1553-1554 (10th Cir. 1988) (observing that "Congress closely modeled the ADEA upon Title VII," and "[t]he statutes are similar both in their aims and in their substantive prohibitions").  *See also Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 395, 102 S.Ct. 1127, 1133 (1982) (noting that the ADEA was modeled after Title VII); *Chavez v. Motorola Inc.*, No. 95-2187, 1996 WL 187546, at *2 (10th Cir. April 18, 1996) (age discrimination cases under ADEA are analyzed under format similar to Title VII actions) (unpublished opinion); *and Parrett v. Raytheon Company,* No. 95-3146, 1996 WL 108494, at *7 (10th Cir. Feb. 29, 1996) (noting that "[s]imilar to Title VII, the ADEA requires that plaintiff file age discrimination charges within 300 days after alleged discriminatory act occurred").

     An inflexible application of the tender back rule would, as a practical matter, prevent courts from determining the conditions under which a release has been obtained.  Plaintiffs with meritorious suits effectively would be precluded from bringing their claims.  As emphasized in

*Hogue, supra,* this would be contrary to Congress' purposes in passing statutes such as the FELA, ADEA, or Title VII.

Subsequent to *Hogue,* but prior to *Oubre*, a number of courts of appeals addressed the applicability of the tender back requirement to a variety of remedial statutes including the ADEA, Section 1983, the Jones Act, and Title VII.  These courts of appeals have produced mixed results. *See Wamsley v. Champlin Refining and Chems., Inc.*, 11 F.3d 534, 539-40 (5th Cir. 1993) (applying tender back requirement to ADEA plaintiff), *cert. denied*, 514 U.S. 1037 (1995); *Forbus v. Sears Roebuck & Co.,* 958 F.2d 1036, 1041 (11th Cir.) (holding no tender back requirement for ADEA plaintiff), *cert. denied*, 506 U.S. 955 (1992); *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993) (applying *Hogue* to conclude that civil rights plaintiff not required to tender back consideration received as prerequisite to initiating Section 1983 action); *Smith v. Pinell*, 597 F.2d 994, 996 (5th Cir. 1979) (no tender back requirement for Jones Act plaintiff).

The Seventh Circuit is the only court of appeals that has issued a ruling about a tender back requirement in a Title VII case.  In *Fleming v. U.S. Postal Service AMF O'Hare*, 27 F.3d 259, 260-62 (7th Cir. 1994), *cert. denied*, 513 U.S. 1085 (1995), the court enforced the tender back requirement for a Title VII employee under a "free-market"- contract law analysis: "[A] premise of a free-market system is that both sides on the market, buyers as well as sellers, tend to gain from freedom of contract." *Id.* at 261.  Because of the language in *Oubre*, the merit of this approach now seems highly questionable.

It is clear that Title VII was created precisely to combat a deficiency in the market, namely inappropriate discrimination, which had the effect of placing parties in unequal bargaining positions.  "The principal goal of Title VII is to eliminate discrimination in employment based on

8

differences of race, color, religion, sex or national origin." *Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997). *See also United Steelworkers of America*, *AFL-CIO-CLC v. Weber*, 443 U.S. 193, 203, 207 (1979) (holding Title VII was a federal statute implemented with the "ultimate statutory goals" of expanding employment opportunities for minorities); *Subia v. Colorado and S. Ry. Co.*, 565 F.2d 659, 662 (10th Cir. 1977) (quoting *Teamsters*, 431 U.S. at 348). In fact, "[o]ne of the primary purposes of Congress in enacting Section 2000e-5(k) was to 'make it easier for a plaintiff of limited means to bring a meritorious suit.'" *Slade v. United States Postal Serv.,* 952 F.2d 357, 361 (10th Cir. 1991). "Title VII remedies are equitable awards intended to advance the dual statutory goals of eliminating the effects of past discrimination and preventing future discrimination." *Pitre v. Western Electric Company, Inc.,* 843 F.2d 1262, 1274 (10th Cir. 1988), *cert. denied*, 510 U.S. 972 (1993). It would appear contrary to Congressional intent to apply a free market approach in interpreting a statute aimed at fighting the market deficiency of improper discrimination.

As previously noted, the *Fleming* approach seems to conflict with the course taken by the Supreme Court in *Oubre*. First, it precludes discharged employees who "have spent the monies received and ... lack the means to tender their return" from bringing suit. *Oubre*, 118 S.Ct. at 842. *See also Kristoferson v. Otis Spunkmeyer, Inc.,* 965 F. Supp. 545, 548 (S.D. N.Y. 1997) (stating "the practical problem [with applying the tender-back rule to Title VII plaintiffs] is that a typical employee will already have spent the monies she received in exchange for the release by the time she learns of its voidability"). This frustrates the fulfillment of the primary objectives underlying Title VII and could prevent many employees from bringing meritorious actions. *Kristoferson*, 965 F.Supp. at 548 (stating "[t]hus, as a practical matter, a strict application of a tender-back

requirement would prevent many [Title VII plaintiffs] from whom releases have been coercively obtained from ever challenging the validity of the releases"). Second, requiring a Title VII claimant to tender back prior to filing suit tempts employers, who wish to discharge employees for discriminatory reasons, to make fraudulent misrepresentations to those employees in the hope that they will sign release agreements in exchange for severance benefits and subsequently "ratify" the agreements by retaining the benefits. *See Oubre*, 118 S.Ct. at 842 (stating that the "realities" that discharged employees are likely to spend the severance pay received as consideration for release agreements may "tempt" employers to circumvent the OWMPA's waiver provisions "knowing it will be difficult to repay the monies and relying on ratification").

The Second, Third and Ninth Circuits all have suggested that federal policies and statutes relating to anti-discrimination should override traditional principles of contract law, such as the tender back rule, and should render those principles inapplicable. *See Long v. Sears Roebuck & Co.,* 105 F.3d 1529 (3d Cir. 1997); *Botefur v. City of Eagle Point*, 7 F.3d 152 (9th Cir. 1993); and *Bormann v. AT & T Communications, Inc.,* 875 F.2d 399 (2d Cir. 1989). In *Bormann,* for example, the Second Circuit explicitly rejected the application of "ordinary contract principles" to the ADEA, in favor a "totality of circumstances standard, which is consistent with the strong congressional purpose underlying the ADEA to eradicate discrimination in employment." *Bormann*, 875 F.2d at 403.

The Tenth Circuit has also applied the "totality of circumstances" approach to the determination of whether a waiver is valid:

> In our view, the totality of the circumstances approach is the better one. While evaluation of the language of the contract is necessary to determine the validity of the waiver of discrimination claims, our inquiry cannot end there. Especially "[i]n light of the strong

>policy concerns to eradicate discrimination in employment, a review of the totality of the circumstances, considerate of the particular individual who has executed the release, is also necessary."

*Torrez v. Public Service Company of New Mexico, Inc.*, 908 F.2d 687, 690 (10th Cir. 1990) (quoting Coventry v. U.S., 856 F.2d 514, 522-23 (3d Cir. 1988)). It would seem inconsistent to apply the contract principles of tender back or ratification to this case, while embracing a "totality of circumstances" analysis to determine the validity of the release.

Furthermore, the tender back approach can be difficult to apply, as exemplified by *Blackwell v. Cole Taylor Bank*, No. 96-C-0902, 1997 WL 156483 (N.D. Ill. March 31, 1997). There, the plaintiff brought suit under both the ADEA and Title VII. The district court was faced with a dilemma. Under *Oberg*, the controlling precedent at the time in the Seventh Circuit, a plaintiff bringing an action under the ADEA was not required to tender back the consideration, but when bringing a Title VII action, under the holding of *Fleming*, he was required to return the consideration. The district court "conclude[d] that the rationale of Fleming may still be preserved by not requiring tender back and reducing the amount of any recovery ... by the amount of the consideration received for the waiver." *Id.* at *3. That approach seems to be the right one for this case too.

After balancing the competing interests and policies involved, I conclude that the preferable way of handling this case is to offset the amount Mr. Rangel received for severance pay from EPNG against any monies he recovers in this case.

   2.  *State Law Claims*

11

The New Mexico Supreme Court has explicitly refused to apply inflexibly the tender back rule:

> It is argued that plaintiff cannot now avoid the effect of the release or compromise of his claim because he has not returned or tendered the consideration paid for the release. It is true that ordinarily a tender or offer to return the consideration paid must be made before a recission of a contract can be accomplished, but the rule is not inflexible, and such tender or restoration will not be required where it clearly appears that the equities between the parties can be fully adjusted in the final decree. We think the better rule is that recission or cancellation will not preclude relief for failure to return the consideration where it is only money paid, the amount of which can be credited in partial cancellation of the injured party's claim.

*Woods v. City of Hobbs*, 75 N.M. 588, 591 (1965) (citations omitted).

In addition, the New Mexico Supreme Court has implied that a court may take into account a party's financial resources in determining whether requiring tender back is appropriate. *See Register v. Roberson Constr. Co., Inc.*, 106 N.M. 243, 246 (1987) (citing *Woods*). As noted earlier, Mr. Rangel has represented under oath that his financial situation made him unable to tender back the severance pay EPNG paid to him.

### B.     Ratification of the Separation Agreement

The ratification and tender back doctrines are closely related. "The 'tender back' requirement is an application to releases of the generally applicable ratification doctrine." *Reid v. IBM Corp.*, No. 95 Civ. 1755(MBM), 1997 WL 357969, at *10 (S.D.N.Y. June 26, 1997). Much of the analysis regarding the tender back doctrine also applies to EPNG's argument about ratification.

"Ratification" means "[c]onfirmation and acceptance of a previous act, thereby making the act valid from the moment it was done." BLACK'S LAW DICTIONARY 521 (Bryan A. Garner, ed. 1996). Two facts seem to dictate conflicting conclusions about ratification. A fact which

inferentially supports EPNG's ratification argument is that Mr. Rangel has retained the consideration he received from EPNG for releasing his claims. This implies that Mr. Rangel sanctioned the Separation Agreement. Militating against this is the fact that within two weeks of signing the Separation Agreement, Mr. Rangel filed a complaint with the EEOC; this behavior is discordant with ratification. Under the totality of circumstances there appears to be a genuine issue of material fact regarding whether Mr. Rangel's actions amounted to ratification, thereby precluding summary judgment.

IT IS THEREFORE ORDERED that:

(1) "Defendant's First Motion to Dismiss or for Summary Judgment" (Doc. No. 3) is DENIED; and

(2) The amount Mr. Rangel received for executing the release must be offset against any amount Mr. Rangel recovers in this lawsuit.

_____
UNITED STATES DISTRICT COURT

13